UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JASMINE CLARK and SIMONE LEGREE, individually and on behalf of all other similarly situated individuals,<br><br>               Plaintiffs,<br><br>v.<br><br>INTELENET AMERICA LLC (d/b/a Intelenet Global Services),<br><br>               Defendant. | Case No.:<br><br>COLLECTIVE AND CLASS ACTION COMPLAINT<br><br>JURY DEMAND |

Plaintiffs JASMINE CLARK and SIMONE LEGREE, individually and on behalf of all others similarly situated, by and through their attorneys, hereby bring this Collective and Class Action Complaint against Defendant INTELENET AMERICA LLC (d/b/a Intelenet Global Services), and state as follows:

**INTRODUCTION**

1.      This is a collective and class action brought pursuant to 29 U.S.C. § 216(b) and Fed. R. Civ. P. 23 by Plaintiffs JASMINE CLARK and SIMONE LEGREE ("Plaintiffs"), individually and on behalf of all similarly situated persons employed by Defendant INTELENET AMERICA LLC (d/b/a Intelenet Global Services) ("Defendant"), arising from Defendant's willful violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, among other laws.

2.      Defendant is a U.S.-based professional call answering service, providing call center services to its customers.

3.      Defendant employed Plaintiffs as non-exempt hourly call center employees (hereinafter referred to as "customer service representatives" or "CSRs"). CSRs, including

1

Plaintiffs, work from home via a remote virtual private network ("VPN") or from Defendant's brick-and-mortar call centers.

4.   Upon information and belief, Defendant operates at least two brick-and-mortar call centers from campus locations in Campbellsville, Kentucky and Fort Wayne, Indiana.

5.   The U.S. Department of Labor ("DOL") recognizes that call center jobs, like those held by Defendant's CSRs, are homogenous; in July 2008, it issued Fact Sheet #64 to alert call center employees to some of the abuses that are prevalent in the industry. (***Exhibit 1***, DOL Fact Sheet #64.)

6.   One of those abuses, which is at issue in this case, is the employer's refusal to pay for work "from the beginning of the first principal activity of the workday to the end of the last principal activity of the workday." (*Id*.)

7.   More specifically, DOL Fact Sheet #64 condemns an employer's non-payment of an employee's necessary pre-shift activities: "An example of the first principal activity of the day for agents/specialists/representatives working in call centers includes starting the computer to download work instructions, computer applications and work-related emails." (*Id.*) Additionally, the FLSA requires that "[a] daily or weekly record of all hours worked, including time spent in pre-shift and post-shift job-related activities, must be kept." (*Id*.)

8.   Defendant requires its hourly CSRs to work a full-time schedule, plus overtime. However, Defendant does not compensate CSRs for all work performed; instead, Defendant only pays the CSRs *after* they have loaded several essential software programs on their computers and are available to accept calls. This policy results in CSRs not being paid for all time worked, including overtime.

9.   Defendant's CSRs use multiple computer programs, software programs, and

applications in the course of performing their responsibilities. These programs and applications are an integral, indispensable, and important part of CSRs' work, as they cannot perform their jobs effectively without them.

10.     Defendant's CSRs perform the same basic job duties and are required to use the same or similar computer programs, software programs, applications, and phone systems.

11.     Defendant also required or permitted CSRs to perform off-the-clock work at the end of their shifts when they were required to shut down and log-out of the essential computer software used to perform their jobs.

12.     The individuals Plaintiffs seek to represent in this action are current and former at-home and brick-and-mortar customer service representatives who worked for Defendant and are similarly situated to each other in terms of their common experience of Defendant's violations of federal and state law.

13.     Defendant knew or could have easily determined how long it takes the CSRs to complete their off-the-clock work, and Defendant could have properly compensated Plaintiffs and the putative Collective and Class for this work, but did not.

14.     Plaintiffs seek a declaration that their rights, and the rights of the putative Collective and Class were violated, an award of unpaid wages, an award of liquidated damages, injunctive and declaratory relief, attendant penalties, and an award of attorneys' fees and costs to make them whole for damages they suffered, and to ensure that they and future workers will not be subjected by Defendant to such illegal conduct in the future.

## **JURISDICTION**

15.     This Court has subject matter jurisdiction over Plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under 29 U.S.C. § 201, *et*

*seq.*

16.     Additionally, this Court has jurisdiction over Plaintiffs' FLSA claims pursuant to 29 U.S.C. § 216(b), which provides that suit under the FLSA "may be maintained against any employer . . . in any Federal or State court of competent jurisdiction."

17.     Moreover, this Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). This is a class action in which the aggregate claims of the individual Class members exceed the sum value of $5,000,000 exclusive of interest and costs, there are believed to be in excess of 100 Class members, and at least some members of the proposed class have a different citizenship than Defendant.

18.     Defendant's annual sales exceed $500,000, and Defendant has more than two employees; thus, the FLSA applies in this case on an enterprise basis. Defendant's employees, including Plaintiffs, engage in interstate commerce or in the production of goods for commerce; therefore, they are also covered by the FLSA on an individual basis.

19.     The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because the state law claims and the federal claims are so closely related that they form part of the same case or controversy under Article III of the United States Constitution.

20.     The Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

21.     The Court has personal jurisdiction over Defendant because Defendant conducts business within the state of New Jersey, employs individuals within the state of New Jersey, and is registered with the New Jersey Department of State.

22.     Personal jurisdiction also applies to Defendant because Defendant has

purposefully availed itself of the privilege of conducting activities in the state of New Jersey and has established minimum contacts sufficient to confer jurisdiction over Defendant; and the assumption of jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice and is consistent with the Constitutional requirements of due process.

### VENUE

23.     Venue is proper in the District of New Jersey because Defendant employs CSRs in this district, and a substantial portion of the events forming the basis of this suit (including implementation of the illegal pay practices alleged in this litigation) occurred in the District of New Jersey.

### PARTIES

24.     Plaintiff JASMINE CLARK ("Plaintiff Clark") is a Florida resident who has worked for Defendant as an at-home CSR in Orlando, Florida since January 2018. Defendant compensates Plaintiff Clark through the payment of an hourly wage, most recently at the rate of $11.25 per hour. (***Exhibit 2***, Clark Pay Stub.) Plaintiff Clark signed a consent form to join this collective action lawsuit. (***Exhibit 3***, Clark Consent to Join.)

25.     Plaintiff SIMONE LEGREE ("Plaintiff Legree") is a South Carolina resident who has worked for Defendant as an at-home CSR in Irvington, New Jersey since January 2018. Defendant compensates Plaintiff Legree through the payment of an hourly wage, most recently at the rate of $11.25 per hour. (***Exhibit 4***, Legree Pay Stub.) Plaintiff Legree signed a consent form to join this collective action lawsuit. (***Exhibit 5***, Legree Consent to Join.)

26.     Defendant INTELENET AMERICA LLC is a Pennsylvania Limited Liability Company (Entity Number 3153230) with a Principal Office at 1001 28th Street South, Fargo, North Dakota 58103. Defendant is licensed to do business in the state of New Jersey (Entity ID:

0400395554), and its registered agent for service of process in New Jersey is The Corporation Trust Company, 820 Bear Tavern Road, West Trenton, New Jersey 08628.

27.     Upon information and belief, Defendant is a wholly owned subsidiary of Intelenet Global Services, a business process outsourcing and contact center provider firm headquartered in Mumbai, India. (*See generally* https://www.intelenetglobal.com/ (last visited on August 29, 2018).)

28.     Upon information and belief, Defendant has employed hundreds, if not thousands, of CSRs throughout the United States in the last three years.

## GENERAL ALLEGATIONS

29.     As CSRs for Defendant, Plaintiffs are responsible for, among other things, responding to inbound telephone calls from card members of Defendant's clients—such as American Express—and assisting those card members who want to redeem their reward points to book trips. Plaintiffs' responsibilities include providing travel options, booking travel, assisting with navigation of the travel website, and cancelling trips.

30.     Defendant used a number of titles to refer to CSRs, including, but not limited to: Agents and Travel Care Professionals. Plaintiffs were employed as at-home Agents but performed the job duties of all other types of CSRs.

31.     Upon information and belief, all CSRs were hourly, non-exempt employees.

32.     Defendant's CSRs use similar computer networks, software programs, and applications in the course of performing their job responsibilities. These programs and applications are integral and an important part of the CSRs' work, and they cannot perform their jobs without them.

33.     Defendant's CSRs received substantially the same training, were subject to the

same disciplinary policies, and were subject to quality assurance reviews based on the same or similar criteria.

34.     Defendant expressly instructed and trained CSRs to have all their computer networks, software programs, and applications opened and ready at the start of their scheduled shifts and before they changed their status to "Ready" or "Auto In" to receive incoming calls.

35.     For example, The Learn Center job expectations board, an online outlet used by Defendant to communicate with CSRs regarding company rules and policies, conveyed the following uniform message to CSRs concerning Defendant's on-time policy:

> **EARLY IS ON-TIME, ON TIME IS LATE, AND LATE IS UNACCEPTABLE** What is on-time? Being clocked in **AND** logged into your phone at your **scheduled start time AND** being ready to work!! If you are not logged into your **PHONE** on-time, you will be counted as "tardy". … It is unacceptable to clock in and log in and sit in aux o until you are good and ready to start working. You must hit "**READY**" or "**AUTO IN**" as soon as you log into your **PHONE**.

(***Exhibit 6***, The Learn Center, On-Time Policy – 09/28/2017 (emphasis in original).)

36.     Defendant enforced this policy through its quality assurance grading system.

37.     Defendant's Quality Assurance Team ("QAT") monitored and used a point system to grade CSRs' calls.

38.     For example, before a CSR could service a customer, they were required to verify the customer's identity by asking security questions. If the CSR failed to verify the customer's identify, they were marked down by the QAT. As a result, CSRs needed to have all of their work applications up and running to avoid a mark down.

39.     Similarly, the maximum hold time permitted by Defendant was three to four minutes per hold. If the CSR placed a customer on hold for longer than three to four minutes without checking back in with the customer, they were marked down by the QAT. This policy reinforced that CSRs were required to have all computer networks, software programs, and

applications opened and ready at the time they changed their status to "Ready" or "Auto In."

40.     Defendant used the computer program "XactTime" to track CSRs' hours worked for purposes of compensation.

41.     Upon information and belief, XactTime had several paid and unpaid statuses.

42.     Defendant expressly instructed Plaintiffs and all other CSRs that they should not be in a paid state within the program XactTime unless they were prepared to field phone calls.

### A.     **Pre-Shift Off-the-Clock Work**

43.     Pursuant to Defendant's policies, training, and direction, Plaintiffs and all other CSRs are required to start up and log into various secure computer programs, software programs, and applications in order to access information. The pre-shift startup and login process takes substantial time on a daily basis with said time approximating 15 minutes per shift, or even longer when technical issues arise. Before clocking in, Plaintiffs and each CSR must undertake the following essential work tasks in chronological order:

1) CSRs must locate their workstation and turn-on/warm-up their computer.

2) CSRs must log into their computer and Microsoft Windows according to the following regimented process:[1]

   a. Once the computer finishes booting up, a McAfee Endpoint Encryption box will appear. CSRs must enter their AD username in the User name box then hit Enter.

   b. Enter McAfee Encryption password in the Password box and hit Enter.

   c. Click on "OK" on the Windows warning message screen.

   d. When the Windows login box comes up, click on "Switch User."

   e. Click on the "Network Logon" icon in the lower right corner.

   f. Click on "Connect" to open the VPN login window, make sure you are using the correct "Group," enter Windows/VPN credentials, and click ok.

---

[1] (*See **Exhibit 7***, Computer/Windows Login Steps.)

The VPN will connect.

    g.  Click on "Other User."

    h.  Enter Windows/VPN credentials (AD username/password), and then press the "Enter" key. Windows will then load.

3)  Once they complete the Computer/Windows login steps, CSRs must launch the required software programs used for their work so that they are prepared to take calls (i.e., are "phone ready") at the start of their shift. The required steps entail the following:

    a.  CSRs must wait for Cisco IP Communicator to automatically load.

    b.  Open Firefox.

    c.  Launch and sign into ADT (software program used to verify a customer's identity and to log, book, change, modify or cancel reservations).

    d.  Launch Internet Explorer and then search for, open and sign into the LMS Learn Center and Ask webpages.

    e.  Sign into Spark (an inter-office communication system) and join two assigned chatrooms (one is a group chat assigned to CSRs according to their last name and the other is a group chat comprising the CSRs' team members and team leader).

    f.  Open softphone system (Voyager), input login numbers, but do not hit login until the next step is complete.

    g.  Open a new tab in Internet Explorer and login to XactTime.

    h.  Click on the open Voyager window, select "Login," change status to "Ready" and begin receiving calls.

44.    Defendant's CSRs complete this process before clocking in each shift, meaning that they perform off-the-clock work approximating 15 minutes per shift without compensation.

45.    Aside from connecting remotely to the VPN, the boot-up process for at-home CSRs is otherwise the same as if they were booting-up in Defendant's brick-and-mortar call centers.

46.    The unpaid off-the-clock work performed prior to each shift by Plaintiffs and other CSRs directly benefits Defendant, and the tasks undertaken in connection with the off-the-

clock work are integral and indispensable to their job duties and responsibilities as CSRs.

47.     In addition to the unpaid pre-shift login activities articulated above, Defendant expressly trained and instructed its newly hired CSRs to login to their training sessions "5-10 minutes early so we may begin class promptly at 8:00am." (***Exhibit 8***, Email from Learning Specialist Shirley Carlisle to Plaintiff Clark and newly hired CSRs (January 5, 2018).)

48.     Defendant reinforced this policy by marking CSRs late if they were not logged into their training sessions at their scheduled start time.

49.     In order to login to their training sessions "5-10 minutes early," as instructed, newly hired CSRs were required to begin the pre-shift start-up/log-in activities 20 to 25 minutes before the scheduled start of their training sessions.

50.     Newly hired CSRs were not paid for this time nor were they permitted to clock in until the training class began, meaning that they performed unpaid pre-shift work in the range of 20 to 25 minutes per shift during their eight weeks of training.

51.     Since Plaintiffs and all other CSRs typically worked 40 or more hours per week during training (five days per week and eight hours per training session), they should have been paid for this pre-shift work at their overtime premium rates of pay.

**B.      Meal-Period Off-the-Clock Work**

52.     Defendant provides Plaintiffs and the CSRs with one unpaid meal break per shift.

53.     In order to deduct an unpaid meal period from an employees' compensable time, an employee must be completely relieved of his or her employment duties for the entire lunch break. 29 CFR 785.19(a) states:

> Bona fide meal periods. Bona fide meal periods are not work time. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be *completely relieved* from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona

fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating. For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is working while eating. (Emphasis added).

54.     However, Defendant does not provide Plaintiffs and the CSRs with a legitimate bona fide meal period because it requires Plaintiffs and the CSRs to return to their computer stations prior to the end of their meal periods and then to spend off-the-clock time logging back into the necessary computer/software programs and applications needed to begin taking customer calls promptly at the end of their scheduled meal periods.

55.     The work performed by Plaintiffs and Defendant's CSRs during their unpaid meal periods takes substantial time on a daily basis with said time ranging from one to ten minutes per day, or more, depending on whether they were kicked out of their computer programs while on lunch.

**C.      Other Mid-Shift Off-the-Clock Work**

56.     CSRs were often required to perform additional mid-shift off-the-clock work when they experienced technical difficulties with Defendant's software programs, servers, systems or applications.

57.     Pursuant to Defendant's policies, training, and direction, CSRs are required to log out of Defendant's software programs, systems, and applications (including the timekeeping system) and inform a team leader when they experience technical difficulties. The CSR is then given a ticket number and instructed to call the help desk. The help desk will trouble shoot the technical issues with the CSR and get the CSR logged back into the system. If the help desk does not answer, the CSR must sit at his or her workstation and wait for the help desk to return the call. These activities take a substantial amount of time—generally, up to 20 minutes or more per incident.

58.     So long as it takes seven minutes or less to resolve the technical issue, CSRs are paid for this time. If, however, it takes longer than seven minutes to resolve the technical issue, Defendant maintained a common policy and practice of not paying CSRs for this time.

59.     Generally, mid-shift technical difficulties will take at least 20 or more minutes to resolve because resolution typically requires Defendant to furnish the CSR with a new password for the ADT software program, and there is a 20-minute lag between the time that a new ADT password is requested and the time that it is received. Thus, CSRs are rarely, if ever, compensated for their time spent resolving mid-shift technical issues.

60.     Notwithstanding the fact that technical difficulties are invariably the product of Defendant's software programs, servers, systems or applications, Defendant maintains a common policy and practice pursuant to which it does not pay its CSRs for time spent resolving technical issues where such time exceeds seven minutes. This policy results in CSRs not being paid for all time worked, including overtime.

61.     Plaintiff Clark estimates that, throughout her time as a CSR for Defendant, she encountered mid-shift technical difficulties on approximately three occasions and that each incident took at least 20 minutes to resolve. Plaintiff Clark has spoken with numerous other CSRs who have represented to her that they, too, encountered mid-shift technical difficulties but on a far more routine basis, and that each incident took upwards of 20 minutes to resolve.

### D.     Post-Shift Off-the-Clock Work

62.     Pursuant to Defendant's policies, training and direction, Plaintiffs and all other CSRs are required to shut down and logout of certain computer programs and applications they use during their shift *after* they log-out of Defendant's timekeeping system. The post-shift logout and shutdown process takes substantial time on a daily basis with said time ranging from three to

four minutes per shift, but can take as long as ten minutes if the CSR experiences technical problems with the computer/software/applications.

63.     Pursuant to Defendant's policies, training and direction, Plaintiffs and the CSRs are not allowed to begin the shutdown and log-out process until after their shifts end and after they clock out of Defendant's timekeeping system. In this regard, Defendant requires Plaintiffs and the CSRs to clock out of the timekeeping system right at the end of their scheduled shifts, as opposed to when they finish performing all work activities and tasks.

64.     In fact, if a CSR ignores Defendant's directive and clocks out of the timekeeping system *after* completing the shut down and logout process, Defendant will adjust the CSR's clock-out time to coincide with the CSR's scheduled end of shift time.

65.     Consequently, Defendant maintains a common plan and policy pursuant to which it fails to pay CSRs for no less than three to four minutes per day of work performed in connection with their end of shift shutdown and log-out activities.

66.     The unpaid off-the-clock work performed subsequent to each shift by Plaintiffs and other CSRs directly benefits Defendant, and the tasks undertaken in connection with the off-the-clock work are integral and indispensable to their job duties and responsibilities as CSRs.

**E.     Exemplary Pay-Periods to Illustrate Pre- and Post-Shift Compensation Deficiencies**

67.     An example of specific workweeks where Defendant failed to pay Plaintiffs all overtime due for hours worked in excess of 40 hours (as mandated by the FLSA) includes the following:

**Pay Period of 01/07/2018 to 01/20/2018**

- Plaintiff Clark was paid at a rate of $11.25 per hour for her 79.98 regular hours and $16.875 per hour for 0.20 overtime hours.

- With unpaid pre-shift, mid-shift, and post-shift time, in a range of 19 to 29 minutes

13

per shift, at five shifts per week, Plaintiff Clark should have been paid an additional 95-145 minutes at her overtime rate of $16.875 during the pay period.

(*Exhibit 2*, Clark Pay Stub.)

### Pay Period of 07/08/2018 to 07/21/2018

- Plaintiff Legree was paid at a rate of $11.25 per hour for her 73.45 regular hours and $16.875 per hour for 23.43 overtime hours.

- With unpaid pre-shift, mid-shift, and post-shift time, in a range of 19 to 29 minutes per shift, at five shifts per week, Plaintiff Legree should have been paid an additional 95-145 minutes at her overtime rate of $16.875 during the pay period.

 (*Exhibit 4*, Legree Pay Stub.)

### F.     If a CSR is Tardy for Work, Defendant Rounds Their Time to the Next Quarter Hour

68.     In addition to the above-described pre-, mid-, and post-shift off-the-clock work, Defendant expressly instructed Plaintiffs and all other CSRs that if they are "tardy" for their shift—defined as "logging on the phones more than 3 minutes late for the start of a shift and returning late from project time, training, breaks, meals, etc."—the tardy is "rounded up to the next quarter hour and counted towards accumulated unscheduled hours balance. Example: 7 minutes late will be counted as .25 hours tardy; 16 minutes late will be counted as .50 hours tardy." (*Exhibit 9* Employee Handbook – October 2013 – Page 31 of 56 – Version 1.4 updated June 2017; *see also Exhibit 10*, The Learn Center, Attendance Policy – 06/03/2018.)

69.     For example, if a CSR logs onto the phones at 8:04 for an 8:00 shift, the CSR will be considered four minutes late and will be counted as .25 hours tardy. (*Id.*) The 15-minute tardy "will be deducted from an employee's applicable and available PTO. If no PTO is available, **time is unpaid**." (*Exhibit 9* (emphasis added).)

70.     Importantly, CSRs will be "tardy" if they begin the pre-shift start-up/login process at their scheduled start time. As noted above, the pre-shift startup and login process takes

approximately 15 minutes per shift. Thus, if a CSR turns on their computer promptly at the start of a scheduled 8:00 shift, they will complete the pre-shift login process and log onto the phones at approximately 8:15. Pursuant to Defendant's policies and procedures, the CSR will be considered 15 minutes late which will be counted as .50 hours tardy. (*Exhibits 9* and *10*.) The 30-minute tardy will be deducted from the CSR's PTO; if no PTO is available, the time is unpaid. (*Exhibit 9*.) Thus, in order to avoid being "tardy" for their shifts, CSRs must begin their pre-shift start-up/login activities *at least* 12 minutes before their scheduled shift.

71.    Consequently, Defendant maintains a common plan and policy pursuant to which it penalizes CSRs for being "tardy" by rounding the tardy to the next quarter hour, counting it towards an "accumulated unscheduled hours balance," and deducting the balance from the CSRs' PTO bank. If no PTO is available, Defendants dock the CSRs' pay. This blatantly illegal policy results in CSRs not being paid for all time worked, including overtime.

### G.    Defendant Benefitted from the Uncompensated Off-the-Clock Work

72.    At all relevant times, Defendant directed and directly benefited from the work performed by Plaintiffs and similarly situated employees in connection with the above-described pre-, mid-, and post-shift activities performed by Plaintiffs and other CSRs.

73.    At all relevant times, Defendant controlled the work schedules, duties, protocols, applications, assignments and employment conditions of Plaintiffs and other CSRs.

74.    At all relevant times, Defendant was able to track the amount of time Plaintiffs and the other CSRs spent in connection with the pre-, mid-, and post-shift activities. However, Defendant failed to do so and failed to compensate Plaintiffs and other CSRs for the off-the-clock work they performed.

75.    At all relevant times, Plaintiffs and the CSRs were non-exempt hourly employees,

subject to the requirements of the FLSA.

76.    At all relevant times, Defendant used its attendance and adherence policies against Plaintiffs and the CSRs in order to pressure them into performing the pre-, mid-, and post-shift off-the-clock work.

77.    Defendant expressly trained and instructed Plaintiffs and its other CSRs to perform the above-described pre-shift activities before clocking into Defendant's timekeeping system and their shift's scheduled start time to ensure they were prepared to take calls (i.e., were "phone ready") at the moment their shifts began.

78.    At all relevant times, Defendant's policies and practices deprived Plaintiffs and the CSRs of wages owed for the pre-, mid-, and post-shift activities they performed. Because Defendant's CSRs typically worked 40 hours or more in a workweek, Defendant's policies and practices also deprived them of overtime pay.

79.    Defendant knew or should have known that the time spent by Plaintiffs and other CSRs in connection with the pre-, mid-, and post-shift activities is compensable under the law. Indeed, in light of the explicit DOL guidance cited above, there is no conceivable way for Defendant to establish that it acted in good faith.

80.    Despite knowing Plaintiffs and other CSRs performed work before and after their scheduled shifts and during their meal periods, Defendant failed to make any effort to stop or disallow the off-the-clock work and instead suffered and permitted it to happen.

81.    Unpaid wages related to the off-the-clock work described herein is owed to Plaintiffs and the CSRs at the FLSA mandated overtime premium of one and one-half their regular hourly rate because Plaintiffs and the CSRs regularly worked in excess of 40 hours in a workweek.

### G.     Defendant Failed to Provide its CSRs with Promised Travel Benefits

82.     As part of Defendant's offer of employment and CSRs' acceptance of such offer, Plaintiffs and all other CSRs were promised certain benefits, including International Airlines Travel Agent Network ("IATAN") travel benefits (up to 30% discounts/savings on select airfares, hotels and more).

83.     At all relevant times, Defendant failed to provide the promised IATAN travel benefits to Plaintiffs and all other CSRs.

84.     On numerous occasions, Plaintiffs contacted (via telephone, email and chat room) Defendant's supervisors, management personnel, and human resources department to inquire about the promised travel benefits. On each such occasion, Defendant's representatives either (a) failed to respond to their inquiry, or (b) failed to direct them to, or provide them with information sufficient to access their promised benefits.

85.     The IATAN travel benefits were explicitly promised to Plaintiffs and all other CSRs as an incentive to induce them to work for Defendant. Thus, the promised benefits represent valid consideration in exchange for the CSRs' promise to work for Defendant and were part of the overall compensation and benefits package that Defendant offered (and CSRs accepted) as part of the parties' agreement to forge an employer/employee relationship.

86.     Defendant was contractually obligated to provide Plaintiffs and all other CSRs with all of the compensation/benefits that were promised to them (and that the CSRs accepted) as part of the parties' agreement to forge an employer/employee relationship.

87.     To this day, Defendant continues to offer IATAN travel benefits to its prospective CSRs and advertises such benefits on various online CSR job postings.

88.     Defendant breached its contracts with Plaintiffs and all other CSRs by, *inter alia*,

failing to provide them with the promised IATAN travel benefits.

**FLSA COLLECTIVE ACTION ALLEGATIONS**

89.     Plaintiffs bring this action pursuant to 29 U.S.C. § 216(b) of the FLSA on their

own behalf and on behalf of:

> *All similarly situated current and former hourly at-home and brick-and-mortar*
> *Customer Service Representatives who worked for Defendant at any time within*
> *three years from the date this lawsuit was filed through judgment.*

(hereinafter referred to as the "FLSA Collective"). Plaintiffs reserve the right to amend this

definition if necessary.

90.     Defendant is liable under the FLSA for, *inter alia*, failing to properly compensate

Plaintiffs and other similarly situated CSRs.

91.     Excluded from the proposed FLSA Collective are Defendant's executives,

administrative and professional employees, including computer professionals and outside

salespersons.

92.     Consistent with Defendant's policy and pattern or practice, Plaintiffs and the

members of the FLSA Collective were not paid premium overtime compensation when they

worked beyond 40 hours in a workweek.

93.     Defendant assigned and/or was aware of all of the work that Plaintiffs and the

members of the FLSA Collective performed.

94.     As part of its regular business practices, Defendant intentionally, willfully, and

repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to

Plaintiffs and the members of the FLSA Collective. This policy and pattern or practice includes,

but is not limited to:

> a.  Willfully failing to pay its employees, including Plaintiffs and the
>     members of the FLSA Collective, premium overtime wages for hours
>     worked in excess of 40 hours per workweek;

        b.   Willfully failing to record all of the time that its employees, including Plaintiffs and the members of the FLSA Collective, worked for the benefit of Defendant.

95.    Defendant is aware or should have been aware that federal law required it to pay Plaintiffs and the members of the FLSA Collective overtime premiums for hours worked in excess of 40 per workweek.

96.    Defendant's unlawful conduct has been widespread, repeated, and consistent.

97.    A collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiffs under 29 U.S.C. § 216(b). The employees on behalf of whom Plaintiffs bring this collective action are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policy, or plan; and (d) their claims are based upon the same factual and legal theories.

98.    The employment relationships between Defendant and every proposed FLSA Collective member are the same and differ only by name, location, and rate of pay. The key issues – the amount of uncompensated pre-shift start-up/log-in time, unpaid meal period time, and the amount of post-shift shut-down/log-out time owed to each employee – do not vary substantially among the proposed FLSA Collective members.

99.    Many similarly situated current and former CSRs have been underpaid in violation of the FLSA and would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

100.    This notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

101.    Those similarly situated employees are known to Defendant, are readily identifiable and can be located through Defendant's records.

102.    Plaintiffs estimate the proposed FLSA Collective, including both current and

former employees over the relevant period, will include several hundred, if not thousands, of workers. The precise number of FLSA Collective members should be readily available from a review of Defendant's personnel and payroll records.

## RULE 23 NATIONWIDE CLASS ACTION ALLEGATIONS

103.   Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(3) on their own behalf and on behalf of:

> *All similarly situated current and former hourly at-home and brick-and-mortar Customer Service Representatives who worked for Defendant at any time within the relevant statutory period through judgment.*

(hereinafter referred to as the "Rule 23 Class"). Plaintiffs reserve the right to amend the putative class definition if necessary.

104.   The members of the Rule 23 Class are so numerous that joinder of all Rule 23 Class members in this case would be impractical. Plaintiffs reasonably estimate there are hundreds, if not thousands, of Rule 23 Class members. Rule 23 Class members should be easy to identify from Defendant's computer systems and electronic payroll and personnel records.

105.   There is a well-defined community of interest among Rule 23 Class members and common questions of law and fact predominate in this action over any questions affecting individual members of the Rule 23 Class. These common legal and factual questions include, but are not limited to, the following:

    a.    Whether the time Rule 23 Class members spent on pre-shift activities prior to clocking in for each shift is compensable time;

    b.    Whether the time Rule 23 Class members spent on post-shift activities subsequent to clocking out for each shift is compensable time;

    c.    Whether Rule 23 Class members are owed wages for time spent performing off-the-clock work activities, and if so, the appropriate amount thereof; and

    d.    Whether Defendant's non-payment of wages for all compensable time

amounted to a breach of contract.

106.    Plaintiffs' claims are typical of those of the Rule 23 Class in that they and all other Rule 23 Class members suffered damages as a direct and proximate result of Defendant's common and systemic payroll policies and practices. Plaintiffs' claims arise from the same policies, practices, promises and course of conduct as all other Rule 23 Class members' claims, and their legal theories are based on the same legal theories as all other Rule 23 Class members.

107.    Plaintiffs will fully and adequately protect the interests of the Rule 23 Class and have retained counsel who are qualified and experienced in the prosecution of nationwide wage and hour class actions. Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Class.

108.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, *inter alia*, it is economically infeasible for Rule 23 Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer. Prosecution of this case as a Rule 23 Class action will also eliminate the possibility of duplicative lawsuits being filed in state and federal courts throughout the nation.

109.    This case will be manageable as a Rule 23 Class action. Plaintiffs and their counsel know of no unusual difficulties in this case, and Defendant has advanced, networked computer and payroll systems that will allow the class, wage, and damages issues in this case to be resolved with relative ease.

110.    Because the elements of Rule 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393; 130 S. Ct. 1431, 1437 (2010) ("[b]y its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

111.     Because Defendant acted and refused to act on grounds that apply generally to the Rule 23 Class and declaratory relief is appropriate in this case with respect to the Rule 23 Class as a whole, class certification pursuant to Rule 23(b)(2) is also appropriate.

**COUNT I**
**(29 U.S.C. § 216(b) Collective Action)**
**VIOLATION OF FLSA, 29 U.S.C. § 201, *et seq*.**
**FAILURE TO PAY OVERTIME WAGES**

112.     Plaintiffs re-allege and incorporate all previous paragraphs herein.

113.     At all times relevant to this action, Defendant was engaged in interstate commerce, or in the production of goods for commerce, as defined by the FLSA.

114.     At all times relevant to this action, Plaintiffs and the FLSA Collective were "employees" of Defendant within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA.

115.     Plaintiffs and the FLSA Collective, by virtue of their job duties and activities actually performed, are all non-exempt employees.

116.     Plaintiffs and the FLSA Collective either: (1) engaged in commerce; or (2) engaged in the production of goods for commerce; or (3) were employed in an enterprise engaged in commerce or in the production of goods for commerce.

117.     At all times relevant to this action, Defendant "suffered or permitted" Plaintiffs and the FLSA Collective to work and thus "employed" them within the meaning of 29 U.S.C. § 203(g) of the FLSA.

118.     At all times relevant to this action, Defendant required Plaintiffs and the FLSA Collective to perform no less than 19 minutes and as much as 29 minutes of off-the-clock work per shift, but failed to pay these employees the federally mandated overtime compensation for the off-the-clock work.

119.     The off-the-clock work performed every shift by Plaintiffs and the FLSA

Collective is an essential part of their jobs, and these activities and the time associated with these activities are not *de minimis*.

120.     In workweeks where Plaintiffs and other FLSA Collective members worked 40 hours or more, the uncompensated off-the-clock work time, and all other overtime should have been paid at the federally mandated rate of 1.5 times each employee's regularly hourly wage, including the shift differential where applicable. 29 U.S.C. § 207.

121.     Defendant's violations of the FLSA were knowing and willful. Defendant knew or could have determined how long it takes for its CSRs to perform their off-the-clock work. Further, Defendant could have easily accounted for and properly compensated Plaintiffs and the FLSA Collective for these work activities, but did not.

122.     The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, an employee is entitled to his or her unpaid wages (including unpaid overtime), plus an additional equal amount in liquidated damages (double damages), plus costs and reasonable attorneys' fees.

## COUNT II
### (Rule 23 Nationwide Class Action)
### BREACH OF CONTRACT

123.     Plaintiffs re-allege and incorporate all previous paragraphs herein.

124.     At all times relevant to this action, Defendant had a contract with Plaintiffs and every other Rule 23 Class member to pay each employee for each hour they worked at a pre-established (contractual) regular hourly rate.

125.     Each Rule 23 Class member's contractual hourly rate is identified in paystubs and other records that Defendant prepares as part of its regular business activities.

126.     Plaintiffs and every other Rule 23 Class member performed under the contract by doing their jobs and carrying out the off-the-clock activities that Defendant required or accepted.

127.    By not paying Plaintiffs and every other Rule 23 Class member the agreed upon hourly wage for all of the work they performed each shift, Defendant systematically breached its contracts with Plaintiffs and each member of the Rule 23 Class.

128.    Plaintiffs' and the Rule 23 Class members' remedies under the FLSA are inadequate in this case to the extent Defendant paid them more than the federally mandated minimum wage of $7.25 per hour but less than 40 hours per week (i.e., pure gap time claims).

129.    Defendant also breached its duty of good faith and fair dealing by failing to keep track of the time Plaintiffs and other Rule 23 Class members spent performing off-the-clock activities, which is a fundamental part of an employer's job.

130.    Defendant also breached its contracts with Plaintiffs and all other CSRs by failing to provide them the promised IATAN travel benefits.

131.    As a direct and proximate result of Defendant's breaches of the contracts alleged herein, Plaintiffs and every other member of the Rule 23 Class have been damaged, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on the behalf of the putative Collective and Rule 23 Class, request judgment as follows:

a.    Certifying this case as a collective action in accordance with 29 U.S.C. § 216(b) with respect to the FLSA claims set forth herein (Count I);

b.    Certifying this action as a class action (for the Rule 23 Class) pursuant to Rule 23(b)(2) and (b)(3) with respect to Plaintiffs' state law claims (Count II);

c.    Ordering Defendant to disclose in computer format, or in print if no computer readable format is available, the names and addresses of all collective action Class members and Rule 23 Class members, and permitting Plaintiffs to send notice of this action to all those similarly situated individuals, including the publishing of notice in a manner that is reasonably calculated to apprise the class members of their rights by law to join and participate in this lawsuit;

d.     Designating Plaintiffs as the representative of the FLSA collective action Class and the Rule 23 Class, and undersigned counsel as Class counsel for the same;

e.     Declaring Defendant violated the FLSA and the Department of Labor's attendant regulations as cited herein;

f.     Declaring Defendant's violation of the FLSA was willful;

g.     Declaring Defendant breached its contracts with Plaintiffs and the members of the Rule 23 Class by failing to pay them for each hour they worked at a pre-established (contractual) regularly hourly rate;

h.     Granting judgment in favor of Plaintiffs and against Defendant and awarding Plaintiffs and the collective action Class and the Rule 23 Class, the full amount of damages and liquidated damages available by law;

i.     Awarding reasonable attorneys' fees and costs incurred by Plaintiffs in filing this action as provided by statute;

j.     Awarding pre- and post-judgment interest to Plaintiffs on these damages; and

k.     Awarding such other and further relief as this Court deems appropriate.

## **JURY DEMAND**

Plaintiffs, individually and on behalf of all others similarly situated, by and through their attorneys, hereby demand a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the court rules and statutes made and provided with respect to the above entitled cause.

Respectfully Submitted,

Dated: September 20, 2018

/s Jason T. Brown
Jason T. Brown (NJ Bar No. 35921996)
Nicholas Conlon (NJ Bar No. 34052013)
JTB LAW GROUP, LLC
155 2nd Street, Suite 4
Jersey City, New Jersey 07302
Phone: (877) 561-0000
jtb@jtblawgroup.com
nicholasconlon@jtblawgroup.com

Jason J. Thompson (will *pro hac vice*)
Rod M. Johnston (will *pro hac vice*)
SOMMERS SCHWARTZ, P.C.
One Towne Square, 17th Floor
Southfield, Michigan 48076
Phone: (248) 355-0300
jthompson@sommerspc.com
rjohnston@sommerspc.com

*Attorneys for Plaintiffs*